LAWRENCE WASDEN
ATTORNEY GENERAL

STEVEN L. OLSEN
Chief of Civil Litigation

CLAY R. SMITH, ISB #6385
Deputy Attorney General
954 W. Jefferson Street, 2nd Floor
P.O. Box 83720
Boise, ID  83720-0010
Telephone:  (208) 334-2400
Facsimile:  (208) 854-8073
        Attorneys for Defendant

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

|  |  |
|---|---|
| JENNIE LINN MCCORMACK, on behalf of herself and all others similarly situated, and in the interests of the general public, | Case No. 11-CV-00433-BLW |
| Plaintiff, | |
| and | |
| RICHARD HEARN, M.D., on behalf of himself and his patients seeking medical abortions for health reasons prior to fetal viability, | **RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT FILED ON OCTOBER 16, 2012 (DKT. 71)** |
| Plaintiff-in-Intervention | |
| v. | |
| MARK L. HIEDEMAN, Bannock County Prosecuting Attorney, | |
| Defendant. | |

RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT FILED ON OCTOBER 16, 2012
(DKT. 71)

## INTRODUCTION

Plaintiff McCormack and Plaintiff-in-Intervention Hearn (collectively "Plaintiffs") request partial summary judgment declaring several provisions of Title 18, Chapter 6 and, in effect, the entirety of Title 18, Chapter 5 of the Idaho Code unconstitutional. Dkt. 71. With respect to Chapter 6, they contend that Idaho Code §§ 18-606, -608(1) and -608(2) are facially unconstitutional and that prosecution under Idaho Code § l8-605 for alleged violation of § 18-608(1) or -608(2) is barred. Their challenge to Chapter 5—the Pain-Capable Unborn Child Protection Act ("PUCPA")—is facial. Plaintiffs rely upon the undue burden standard established in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), as the basis for invalidating § 18-606, § 18-608(2) and PUCPA and the claimed vagueness of two terms in § 18-608(1) for invalidating that provision. Plaintiffs do not contend that § 18-605, which imposes civil and criminal sanctions upon, *inter alia*, "[a]ny person licensed or certified to provide health care pursuant to title 54, Idaho Code, and who knowingly, except as permitted by the provisions of this chapter, provides, supplies or administers any medicine, drug or substance to any woman or uses or employs any instrument or other means whatever upon any then-pregnant woman with intent to cause or perform an abortion," is independently unconstitutional; *i.e.*, their as-applied challenge to § 18-605 lies only to the extent that § 18-608(1) or -608(2) is held unconstitutional. The motion should be denied.

*First*, McCormack's claims are moot for reasons set out in Defendant Hiedeman's pending motion for partial summary judgment. Dkt. 58. Were this not so, McCormack's showing—which is purely legal in nature—still fails to establish that either (1) the highly unlikely specter of a prosecution under § 18-606(2) constitutes an undue burden for a "substantial fraction" of women who may seek an abortion in Idaho or (2) her Article III or prudential standing to challenge on an as-applied basis the statute's application where the predicate violation arises under § 18-608(2).

*Second*, Hearn's claim directed to § 18-608(1) fails because the terms that he

characterizes as impermissibly vague—"properly" and "satisfactory"—do nothing more than require physicians to adhere to reasonable standard-of-care standards applicable more generally under Idaho law and, in any event, could be severed from the statute even if they failed to give adequate notice of what they require.  His challenge to § 18-608(2), as well as PUCPA, fails in both facial and as-applied contexts because of disputed issues of material fact, which exist with regard to Hearn's standing and the merits, over (1) his medical competency or practical ability to perform medical abortions; (2) the propriety of medical abortions in the second trimester of pregnancy; and (3) whether, given the virtual absence of such abortions during that trimester, the hospital-only requirement imposes an undue burden on the performance of medical abortions.  The same issues of disputed fact exist with respect to the PUCPA claim.

## STATEMENT OF MATERIAL FACTS

**A.**    This case, when whittled down to its core, involves the performance of medical abortions in Idaho by Plaintiff-in-Intervention Hearn.  He is a physician licensed to practice medicine in Idaho.  Dkt. 56 ¶¶ 9-11.  Hearn also is now a full-time attorney and has not practiced medicine actively since 1997.    He has no medical office where he renders medical treatment to patients.  His specialty areas while practicing medicine were nephrology and rheumatology.  Prior to 2010, Hearn performed no abortions and declined to answer questions with respect to the performance of abortions between 2010 and 2012 on the basis of Fifth Amendment privilege.   He has come forward with no facts establishing that he has associated with a physician who is both competent and willing to perform surgical abortions should a medical abortion prove unsuccessful.  Dkt. 79 ¶ 9a.  Hearn, in short, offers no evidence concerning his competence or practical ability to perform medical abortions.[1]

---

[1] The closest that Hearn comes to suggesting his competence to perform medical abortions lies in several paragraphs of the unverified amended complaint-in-intervention:

> 16.    In the early stages of pregnancy, physicians providing abortion services in the United States often prescribe medications approved by the U.S. Federal Drug

Notwithstanding that factual vacuum, Plaintiffs' statement of facts not in dispute outlines Hearn's "plan to perform medical abortions in Bannock County, Idaho." Dkt. 71-3 at 6 (capitalization and bolding omitted).  It states in part:

> 34.    Among those medications approved by the FDA to cause women to abort their pregnancies medically in their homes are mifepristone and misoprostol. The initial approval of a mifepristone- misoprostol protocol by the FDA was for use to induce abortions in women through 49 days of gestation calculated from the last menstrual period (LMP).
>
> 35.    Evidence-based medical abortion regimens differing from the FDA approved protocol for mifepristone-misoprostol were developed in an effort to reduce side effects and to make medical (non-surgical) abortions less expensive, safer and more rapid.
>
> * * * * *
>
> 37.    Methotrexate and misoprostol or misoprostol alone regimens, neither of which are FDA approved to induce abortions, are recognized within the medical community as "off label" alternatives to mifepristone-misoprostol regimens. Whether using the FDA approved method or one of the recognized alternatives, the delivery of the fetus occurs at home with hospitalization reserved only for emergencies.

*Id.* (record citations omitted).  Beyond this cursory analysis, Plaintiffs' statement does not address the protocols attendant to medical abortions or the skills and resources necessary to perform them safely.

**B.    1.**    The term "medical abortion" refers to abortions effected through the administration of drugs and without surgical intervention.  Dkt. 79-1 ¶ 3.  The Federal

---

> Agency ("FDA") to cause women to abort their pregnancies medically, i.e., non-surgically, in the privacy of their homes. Such "medical" abortions are generally less expensive than surgical abortions and are at least as safe.
>
> 17.    As a currently licensed physician holding both a DEA and Idaho State Board of Pharmacy registration, Hearn may legally prescribe medications approved by the FDA to cause women to abort their pregnancies in the privacy of their homes.
>
> * * * * *
>
> 28.    Hearn desires to prescribe FDA approved medications to women in Bannock County, Idaho such as Plaintiff McCormack who, for health reasons, seek to medically terminate their pregnancies in violation of the restrictions contained in Idaho Code Title 18, Chapters 5 and 6 as set forth below prior to fetal viability.

Dkt. 56 ¶¶ 16, 17, 28.

Drug Administration ("FDA") has approved only one medication for specific use in such abortions: Mifeprex, a trade name for mifepristone.  The FDA issued a "drug label," initially issued with the drug's approval and most recently revised in July 2005, which set forth protocols for Mifeprex's use.  Dkt. 79-1 ¶ 5 & Attach. B.  The drug label states that mifepristone "is indicated for the medical termination of intrauterine pregnancy through 49 days' pregnancy."  *Id.*, Attach. B at 5.  Mifeprex, however, must be used in combination with another drug to complete the medical abortion process, and the FDA label specifies misoprostol, a synthetic prostaglandin analogue approved for use in preventing or treating damage from certain anti-inflammatory drugs but which also is used for cervical ripening in pregnant women.  *Id.*, ¶ 5 & Attach. C at 1.  The Mifeprex drug label set the dosage regime as 600 mg mifepristone on day 1 and 400 µg misoprostol administered on day 3.  *Id.*, Attach. B at 4, 13, 17.

Both dosages must be administered in a medical office, clinic or hospital by a physician, or under physician supervision, "able to assess the gestational age of an embryo and to diagnose ectopic pregnancies."  Dkt. 79-2, Attach. B at 13, 17.  The FDA drug label specifies a third office visit approximately 14 days after the mifepristone administration "to confirm by clinical examination or ultrasonographic scan that a complete termination of pregnancy has occurred."  *Id.*, Attach. B at 14.  The drug label also contains a Medication Guide to be given the patient (*id.*, Attach. B at 16-18) and requires that she sign a form Patient Agreement (*id.*, Attach. B at 19)—each of which contains the advisement that mifepristone-based medical abortions are appropriate only through the seventh week of pregnancy, that the medications must be administered in the physician's office, and that a return examination is necessary two weeks after the misoprostol administration.

      **2.**    The FDA drug label, however, does not control the ability of physicians to develop alternative protocols for the administration of a drug.  *See, e.g.*, *Planned Parenthood Cincinnati Region v. Taft*, 444 F.3d 502, 506 (6th Cir. 2006)

("Absent state regulation, once a drug has been approved by the FDA, doctors may prescribe it for indications and in dosages other than those expressly approved by the FDA. This widely employed practice is known as 'off-label' use. Off-label use does not violate federal law or FDA regulations because the FDA regulates the marketing and distribution of drugs in the United States, not the practice of medicine, which is the exclusive realm of individual states."). Off-label protocols have been endorsed in the United States for mifepristone by, *inter alia*, the American College of Obstetricians and Gynecologists ("ACOG") and the National Abortion Federation ("NAF"). Dkt. 79-1 ¶ 5.

ACOG issued Practice Bulletin No. 67 ("Bulletin") in October 2005, reaffirmed in 2011, entitled Medical Management of Abortion whose purpose is "to present evidence of the effectiveness, benefits, and risks of medical abortion and provide a framework for the evaluation and counseling of women who are considering medical abortion." Dkt. 79-1, Attach. C at 1. The Bulletin examined not only mifepristone regimes but also non-mifepristone regimes and issued recommendations and conclusions. Of particular relevance here are its Level A recommendations—those recommendations "based primarily on good and consistent scientific evidence" (*id.*, Attach. C at 8)—that provide:

> • Medical abortion should be considered a medically acceptable alternative to surgical abortion in selected, carefully counseled, and informed women.
> • The FDA-approved protocol of 600 mg of mifepristone orally followed approximately 48 hours later by 400 µg of misoprostol orally is safe and effective for medical abortion through 49 days of gestation (calculated from the first day of the LMP).
> • Compared with the FDA-approved regimen, mifepristone-misoprostol regimens using 200 mg of mifepristone orally and 800 µg of misoprostol vaginally are associated with a decreased rate of continuing pregnancies, decreased time to expulsion, fewer side effects, improved complete abortion rates, and lower cost for women with pregnancies up to 63 days of gestation based on LMP.
> • A methotrexate-misoprostol regimen is appropriate for medical abortion only in pregnancies up to 49 days of gestation. Women using this regimen may wait up to 4 weeks for complete abortion to occur.

- Mifepristone-misoprostol regimens using 200 mg of mifepristone orally and 800 µg of misoprostol vaginally are generally preferred to regimens using methotrexate and misoprostol or misoprostol only for medical abortion.
- A patient can administer misoprostol safely and effectively, orally or vaginally, in her home as part of a medical abortion regimen.

*Id.*[2]  The ACOG Level A recommendations thus departed from the FDA drug label in three material respects by finding consistent with "good and consistent scientific evidence" (1) a dosage regime of 200 mg mifepristone-800 µg misoprostol through the ninth week of pregnancy; (2) a dosage regime of 50 mg methotrexate-800 µg misoprostol through the first seven weeks of pregnancy; and (3) self-administration of the misoprostol dosage by the patient at home—thereby reducing to two the number of physician office visits.[3]

NAF's 2012 Clinical Policy Guidelines differ somewhat from the Bulletin but limit the availability of medical abortions to 63 days under any recommended regime:

- When mifepristone and vaginal, buccal, or sublingual misoprostol are used, the regimen is recommended for gestations up to 63 days.
- When mifepristone and oral misoprostol are used, the regimen is recommended for gestations up to 56 days.
- Where mifepristone is not available and methotrexate and misoprostol are used, the regimen is recommended for gestations up to 63 days.
- Where mifepristone is not available and misoprostol is used, the regimen is recommended for gestations up to 63 days. Combined regimens are more effective than prostaglandin alone.

Dkt. 79-1, Attach. D at 14.   The accompanying discussion summarizes research concerning dosage amounts but, unlike the Bulletin, does not set out specific recommendations.[4]   The guidelines, while establishing as a standard the necessity of

---

[2]  As the Bulletin explained, methotrexate is an FDA-approved drug that "has been used for more than 40 years to treat neoplastic diseases, rheumatoid arthritis, and psoriasis; other medical applications include treatment of systemic lupus erythematosus, dermatomyositis, severe asthma, Crohn's disease, and extrauterine pregnancy."  Dkt. 79-1, Attach. C at 2.

[3]  ACOG did not conclude that elimination of the follow-up examination to ensure that complete abortion had occurred was supported by the requisite good and consistent medical evidence.  *See* Dkt. 79-1 ¶ 6.

[4]  With respect to mifepristone and methotrexate administration, the NAF guidelines state:
  Mifepristone is administered orally. Original trials involved a 600 mg dose, but

giving the patient in individual or group settings "accurate information about the procedure and its alternatives, and the potential risks and benefits" and "the opportunity to have any questions answered to her satisfaction prior to intervention" (*id.*, Attach. D at 3) and thereby anticipates at least one clinic visit, does not address the question whether all medications must be administered in the clinic or whether a follow-up examination is required.   Consequently, the principal explicit difference between the NAF guidelines and the FDA final label lies in expansion of the period from seven to eight or nine weeks for the mifepristone-misoprostol regime depending upon the manner of the latter drug's administration.

      **3.**    Statistics provided by the Idaho Department of Health and Welfare reflect substantial use of medical abortions during the first 63 days of gestation. Aggregated data for the 2007-2011 period report 7523 abortions occurred in Idaho, with 2275 or 30.4 percent classified as medical.   Of those medical abortions, 99 percent were performed during the first nine weeks of pregnancy.   In 2011, 499 medical abortions were performed, which constituted 34.7 percent of all abortions in this State.   98.8 percent were performed during the first nine weeks.   That percentage was unchanged from 2010. Dkt. 79-2, Attach. B.

      The occurrence of medical abortions during the initial 63-day gestational period is not happenstance.   The sole entity performing elective abortions in Idaho—Planned Parenthood of the Great Northwest—has offices in Boise and Twin Falls.   Dkt. 79 ¶ 7.b.

---

     further research indicates that 200 mg provides comparable overall efficacy.  The best studied methotrexate regimen involves 50 mg/m$^2$ (body surface area) given intramuscularly, the same dose used in treating early unruptured ectopic pregnancy. One study found comparable efficacy using a standard 75 mg dose IM, but the results require confirmation. Research also indicates acceptable efficacy when methotrexate is administered orally in doses of 25-50 mg.

Dkt. 79-1, Attach. D at 15.   The guidelines do not address the appropriate dosage level for misoprostol; it instead focuses on the relative efficacy of the drug's buccal and vaginal administration.   *Id.*

The websites for both facilities describe the availability of medical abortions identically:

> Abortion pill (medication abortion) is offered up to 9 weeks after the start of your last menstrual period.  If your last period was more than 9 weeks ago, read about our in-clinic abortion services below.  [¶] Abortion pill (medication abortion) services are available by appointment only.  [¶] During the abortion pill (medication abortion) visit, you must agree—before you start—that you will have an in-clinic abortion if the abortion pill does not work.  [¶] After your abortion pill visit, you will need access to a telephone, transportation, and backup medical care available to you once you are home.[5]

No elective abortions have been performed in Bannock County since 2006.  Doc. 79-3 at 38:1-39:25.

## RELEVANT FED. R. CIV. P. 56 STANDARDS

In resolving a motion for summary judgment under Fed. R. Civ. P. 56, this Court must "'determine, viewing the evidence in the light most favorable to the nonmoving party and drawing all justifiable inferences in its favor, whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law.'"  *Las Vegas Sands, LLC v. Nehme*, 632 F.3d 526, 532 (9th Cir. 2011) (quoting *Orr v. Bank of Am., NT & SA,* 285 F.3d 764, 773 (9th Cir. 2002)).  "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact" and may prevail where "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where subject matter jurisdiction is challenged, "general allegations of injury can suffice at the pleading stage, [but] the

---

[5]  The website pages are available at http://www.plannedparenthood.org/healthcenter/center Details.asp?f2939&a=91810&v=details (Boise Clinic) (last visited Nov. 8, 2012); and http://www.plannedparenthood.org/healthcenter/centerDetails.asp?f=2938&a=91810&v=details# !service=abortion (Twin Falls Clinic) (last visited Nov. 8, 2012).

plaintiff must set forth 'specific facts' to survive a motion for summary judgment based on lack of standing." *Braunstein v. Ariz. Dep't of Transp.*, 663 F.3d 1177, 1184 (9th Cir. 2012).  Standing must be shown, lastly, as to each claim raised by a plaintiff. *E.g.*, *DaimerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Maya v. Centex Corp.*, 658 F.3d 1060, 1068-69 (9th Cir. 2011).

## ARGUMENT

I.  **EVEN WERE McCORMACK'S CLAIMS NOT MOOT, HER FACIAL CHALLENGE TO § 18-606(2) FAILS AT THE SUMMARY JUDGMENT STAGE BECAUSE MATERIAL ISSUES OF FACT EXIST, AND HER AS-APPLIED CHALLENGE TO THAT PROVISION PREDICATED ON THE UNCONSTITIONALITY OF § 18-608(2) FAILS BECAUSE SHE DOES NOT ESTABLISH THE REQUISITE ARTICLE III AND PRUDENTIAL STANDING**

Insofar as Plaintiffs' motion seeks relief on McCormack's behalf with respect to prosecution under § 18-606(2), it is moot for the reasons set out in Hiedeman's memorandums in support of his pending motion for partial summary judgment. Dkt. 58-1, 63.  McCormack's challenge to that statute nevertheless falls short at the Rule 56 stage even if the controversy over its application to her were not moot.  The reasons are straightforward: Her facial challenge to § 18-606(2) fails because she does not establish that the imposition of possible criminal sanctions under § 18-606(2) unduly burdens access to an abortion for a "substantial fraction" of all Idaho women, while her as-applied challenge to that provision fails because she does not establish her standing to challenge § 18-608(2).

A.  **Facial Challenge.**  The Ninth Circuit, like this Court¸ concluded that McCormack possessed a likelihood of success with respect to the facial invalidity of § 18-606(2).  It reasoned in part:

> There can be no doubt that requiring women to explore the intricacies of state abortion statutes to ensure that they and their provider act within the Idaho abortion statute framework, results in an "undue burden" on a woman seeking an abortion of a nonviable fetus.  Under this Idaho statute, a pregnant woman in McCormack's position has three options: (1) carefully read the Idaho abortion

statutes to ensure that she and her provider are in compliance with the Idaho laws to avoid felony prosecution; (2) violate the law either knowingly or unknowingly in an attempt to obtain an abortion; or (3) refrain altogether from exercising her right to choose an abortion.

*McCormack v. Hiedeman*, Nos. 11-36010 & 11-36015, 2012 WL 3932735, at *9 (9th Cir. Sept. 11, 2012) (footnote omitted).   This conclusion is troubling because it exempts from prosecution *knowing*—or the substantively identical "purposely"— violating Chapter 6.   *See infra* 14 n.9 & 16.[6]   Here, no evidence exists that McCormack relied on a representation that any abortifacients that she acquired came from an Idaho licensed physician; her counsel instead represented to the Court that "[t]here is no evidence whether she went to—whether that provider she went to was a physician—and that physician could be licensed in Idaho, you don't—not be a resident here."   Dkt. 19-1 at 22: 13-17.   There is, as well, no evidence that she either inquired or acted under the assumption that the abortifacient provider was a physician or so represented, and Plaintiffs have not challenged the physician-only requirement in § 18-608A.   Accepting the proposition that a woman can never be prosecuted for self-abortion because of the *theoretical* possibility that she may be charged for failing to "police" her abortifacient provider—the theory advanced by Plaintiffs—ignores the "*knowingly*" requirement under § 18-606(2) and elevates the undue burden standard far beyond any heretofore recognized limits.

The correct approach eschews reliance on the broadsword of facial invalidity and subjects the undue burden challenge to as-applied standards that will permit determination of whether the particular prosecution imposes an undue burden on access to abortion.   *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008) ("[f]acial challenges . . . run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance

---

[6]   Idaho courts have construed the term "purposely" consistently with the statutory definition of "knowingly."   *See State v. Macias*, 142 Idaho 509, 511, 129 P.3d 1258, 1260 (Ct. App. 2005) (acting "purposely" did not require "defendant [to] know that the act is illegal").

of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied") (internal quotation marks omitted).  The inappropriateness of a facial approach here appears plain given the virtual absence of such prosecutions and Plaintiffs' offering only rhetoric for the proposition that a "large fraction" of women are dissuaded from pursuing elective abortions merely because they may be subject to criminal prosecution even when they rely in good faith on their providers' compliance with Idaho law.  *Casey*, 505 U.S. at 895.[7]

      **B.**     **As-Applied Challenge.**  "The requisite elements of Article III standing are well established: "'A plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'"  *Hein v. Freedom from Religion Found.*, 551 U.S. 587, 598 (2007).  Prudential standing further prevents litigants, outside the First Amendment context, from relying upon the rights of third parties except in quite limited circumstances.  *E.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004) (in addition to possessing "the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation[,]" the party asserting third party standing must establish "a 'close' relationship with the person who possesses the right" and "there is a 'hindrance' to the possessor's ability to protect his own interests"); *Singleton v. Wulf*,

---

[7] Plaintiffs engage in a strained analysis of how a "large fraction" of Bannock County women who desire abortions will be unduly burdened by the specter of physician prosecution under § 18-605 for noncompliance with §§ 18-608(1) and -608(2)—an analysis that they presumably would have applied to the validity of § 18-606(2) had they simply not relied on the Ninth Circuit opinion.  Dkt. 71-2 at 9-10.  Contrary to that analysis, the proper denominator is all women who seek abortions in Idaho because there is no identifiable subset of persons who are especially burdened by § 18-606(2).  All such women are equally situated with respect to the statute's enforcement—unlike the subclass of women in Pennsylvania who desired abortions without spousal notification.  *Casey*, 505 U.S. at 895 ("it is married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement" to whom the requirement is relevant).  Plaintiffs' attempt to limit the denominator to Bannock County women also fails to acknowledge that facial invalidation of § 18-606(2) would affect *all* Idaho women—not just those in the County.

RESPONSE TO MOTION FOR PARTIAL SUMMARY JUDGMENT FILED ON OCTOBER 16, 2012 (DKT. 71) -11

428 U.S. 106, 113 (1976) ("[f]ederal courts must hesitate before resolving a controversy, even one within their constitutional power to resolve, on the basis of the rights of third persons not parties to the litigation").  McCormack offers no facts to establish that her abortion occurred in a clinic or that an abortion would have been available to her in Bannock County in a physician's office or clinic but for the hospital-only requirement. Consequently, her challenge to § 18-608(2)—the predicate for the as-applied challenge to § 18-606(2)—fails because even if the provision authorized abortions in both hospitals and clinics, McCormack still would have violated the provision.  She also has shown neither of the last two requirements for prudential standing—particularly in light of this Court's denial of class certification (Dkt. 43).  McCormack, in sum, has not borne her obligation to show either Article III or prudential standing as to this claim even were the only possible ground for prosecution under § 18-606(2) non-compliance with § 18-608(2).[8]

## II.   HEARN'S VAGUENESS CHALLENGE TO § 18-608(1) FAILS AS A MATTER OF LAW, AND QUESTIONS OF MATERIAL FACT EXIST OVER HEARN'S STANDING TO CHALLENGE § 18-608(2) AND THE MERITS OF SUCH CHALLENGE

Hearn challenges the application of the criminal and civil sanctions that § 18-605(2) and (3) where the predicate statutory violation lies in noncompliance with § 18-608(1) or (2).  Dkt. 71-1 at 7-12.  He argues that § 18-608(1)'s requirement that, to the extent that an abortion is performed in a physician's clinic or office, it must be "*properly* staffed and equipped for the performance of such procedures" and "the responsible physician or physicians have made *satisfactory* arrangements with one or

---

[8]  McCormack's single-minded focus on § 18-608(2) ignores another predicate for her prosecution: § 18-608A.  She does not challenge the validity of the physician-only requirement. Consequently, she would not be entitled to partial summary judgment with respect to § 18-606(2) even if she possessed standing to challenge § 18-608(2) and prevailed on the merits because prosecution for obtaining an abortion from a non-Idaho licensed physician would have been available.

more acute care hospitals within reasonable proximity thereof providing for the prompt availability of hospital care as may be required due to complications or emergencies that might arise" (emphasis added).   Dkt. 71-1 at 8.   He contends, citing *City of Akron v. Akron Center for Reproductive Health, Inc.*, 462 U.S. 416 (1992), that § 18-608(2)'s hospital-only requirement unduly burdens access to second trimester abortions.   Hearn's vagueness claim directed to § 18-608(1) fails on merits.   Moreover, even were the terms "properly" or "satisfactory" impermissibly vague, they are severable under controlling Idaho Supreme Court precedent.   The challenge to § 18-608(2) fares no better at the Rule 56 stage because Hearn does not establish an absence of material, controverted fact with respect to Hearn's standing and whether, if he does possess standing, that provision imposes an undue burden in the context of medical abortions.

### A.   <u>Section 18-608(1)</u>

**1.**   Hearn argues that the terms properly and satisfactory "are indefinite and fail to establish a specific standard against which criminality can be judged" and their meaning "will vary depending upon the time and place of practice"—*e.g.*, "[w]hat would be considered proper equipment in 1980 in Boise may differ from what would be considered proper equipment in a doctor's office in 2012 in Lava Hot Springs." Dkt. 71-1 at 8. Even if one accepts that the precise scope of those terms may vary on the basis of when and where the abortion occurs, it says nothing about whether the challenged terms are impermissibly vague for Due Process Clause purposes under controlling decisional principles.

The Supreme Court rejected a void-for-vagueness argument directed at the Partial Birth Abortion Ban Act, 18 U.S.C. § 1531, in *Gonzales v. Carhart*, 550 U.S. 124 (2007), and, in doing so, applied a mode of analysis applicable here.   It initially set forth the generally applicable rule for determining vagueness claims: "'[T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a

manner that does not encourage arbitrary and discriminatory enforcement.'" *Id.* at 148-49 (quoting *Kolender v. Lawson*, 461 U.S. 352, 357 (1983)). The Court then examined whether the statute provided "doctors 'of ordinary intelligence . . . a reasonable opportunity to know what is prohibited.'" *Id.* at 149 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Section 1513 provided the requisite specificity by identifying an "anatomical landmark"—in head-first presentations where "the entire fetal head is outside the body of the mother" and in breach presentations where "any part of the fetal trunk past the navel is outside the body of the mother" (18 U.S.C. § 1513(b)(1)(A))—to demarcate the boundary between lawful and unlawful conduct. 550 U.S. at 149. The Court next held that the statute did not "encourage[] arbitrary or discriminatory enforcement" by virtue of its *mens rea*, or scienter, requirement that the physician "knowingly" perform a prohibited partial-birth abortion (18 U.S.C. § 1513(a)).[9]

Section 18-608(1) satisfies both requirements. The terms "properly" and "satisfactory" most logically are read to impose a standard of reasonable physician care with regard, respectively, to staffing and equipment and to hospital-care arrangements. Application of that objective standard comports with application of Idaho statutory construction rules—an application required here[10]—which counsel that a court "should,

---

[9] The Partial Birth Abortion Ban Act does not contain a definition of "knowingly," and no general definition of that term appears in Title 18 of the United States Code. In a prosecution under 18 U.S.C. § 922(g)(6) for possession of firearms after being convicted of misdemeanor domestic violence, the Court of Appeals "has noted the distinction between the requirements of 'willful' and 'knowing' behavior and has declined to import the . . . requirement of actual knowledge of law into a statute that punished 'knowing' behavior, even when the statute arguably is 'highly technical.'" *United States v. Hancock*, 231 F.3d 557, 563 (9th Cir. 2000); *see United States v. Greer*, 640 F.3d 1011, 1020 (9th Cir. 2011) ("The general 'knowingly' instruction addresses *knowledge of unlawful activity.* Specifically, this instruction reaffirms 'the rule that ignorance of the law is no excuse' by clarifying that knowledge of an *act* 'does not include knowledge of the *law*.'").

[10] *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 925 (9th Cir. 2004) ("[a]s we are construing a state statute, our role is to interpret the law as would the Idaho Supreme Court"); *accord Peterson v. Bonneville Jnt. Sch. Dist. No. 93*, 832 F. Supp. 2d 1217, 1220 (D. Idaho 2011).

whenever possible, construe a statute so as to achieve a constitutional result." *Bradbury v. Idaho Judicial Council*, 136 Idaho 63, 68, 28 P.3d 1006, 1011 (2001).  Myriad Idaho decisions address this standard in the malpractice context when applying Idaho Code § 6-1012.[11]

In a seminal decision, *Dulaney v. St. Alphonsus Regional Medical Center*, 137 Idaho 160, 45 P.3d 816 (2002), the Idaho Supreme Court explained:

> An expert testifying as to the standard of care in medical malpractice actions must show that he or she is familiar with the standard of care for the particular health care professional for the relevant community and time. . . . The expert must also state how he or she became familiar with that standard of care. . . . One method for an out-of-area expert to obtain knowledge of the local standard of care is by inquiring of a local specialist.

137 Idaho at 164, 45 P.3d at 820 (citations omitted); *see also Hoover v. Hunter*, 150 Idaho 658, 249 P.3d 851, 855 (2011) (proffered expert testimony failed to "allegedly

---

[11] Section 6-1012 provides:

> In any case, claim or action for damages due to injury to or death of any person, brought against any physician and surgeon or other provider of health care, including, without limitation, any dentist, physicians' assistant, nurse practitioner, registered nurse, licensed practical nurse, nurse anesthetist, medical technologist, physical therapist, hospital or nursing home, or any person vicariously liable for the negligence of them or any of them, on account of the provision of or failure to provide health care or on account of any matter incidental or related thereto, such claimant or plaintiff must, as an essential part of his or her case in chief, affirmatively prove by direct expert testimony and by a preponderance of all the competent evidence, that such defendant then and there negligently failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, as such standard existed at the time and place of the alleged negligence of such physician and surgeon, hospital or other such health care provider and as such standard then and there existed with respect to the class of health care provider that such defendant then and there belonged to and in which capacity he, she or it was functioning.  Such individual providers of health care shall be judged in such cases in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any.  If there be no other like provider in the community and the standard of practice is therefore indeterminable, evidence of such standard in similar Idaho communities at said time may be considered.  As used in this act, the term "community" refers to that geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided.

allege[] familiarity with the local standard of care"); *Ramos v. Dixon*, 144 Idaho 32, 38, 156 P.3d 533, 539 (2007) ("Idaho Code § 6-1012 precludes assuming that the standard of care is uniform throughout Idaho").   A physician desiring to provide first trimester abortion has ample notice that his staffing, equipment and emergency-care arrangements are compliant if they comport with the reasonable standard of professional care in the particular community or, if necessary, similar communities.[12]

The relevant physician-related enforcement provisions—§ 18-605(2) and (3)— impose a "knowingly" scienter requirement.   Under Idaho Code § 18-101.5, "'knowingly[]' imports only a knowledge that the facts exist which bring the act or omission within the provisions of this code" and "does not require any knowledge of the unlawfulness of such act or omission."   That definition parallels the common-law definition applied with respect to federal statutes lacking a specific definition of that term.   *See supra* 14 & n.9.   A physician accordingly becomes criminally liable under § 18-605(3) only if aware that the involved staffing, equipment or hospital-care arrangements fall beneath the reasonable standard of care applicable under § 6-1012. That *mens rea* element significantly cabins the exercise of prosecutorial discretion—as did the same term in *Carhart*.

> 2.     Even were "properly" and "satisfactory" impermissibly vague, they would be subject to severance under Idaho decisional law.   Idaho rules of statutory construction once again govern the severability issue.   *E.g.*, *Acosta v. City of Costa Mesa*, 694 F.3d 980, 973-74 (9th Cir. 2012); *Am. Bankers Ass'n v Lockyer*, 541 F.3d 1214,

---

[12] So, for example, even if it is assumed that ordinary obstetrical and gynecological standard of care available in Pocatello were deemed inapplicable to the performance of abortions, a court could look to the staffing, equipment and emergency-care arrangements at the Twin Falls facility of Planned Parenthood of the Great Northwest.   This Court may take judicial notice under Fed. R. Civ. P. 201(b) that Twin Falls is 118 miles from Pocatello via Interstate 84.   *See* http://maps.google.com/maps?oe=utf-8&rls=org.mozilla:en-US:official&client=firefox-a&um=1 &ie=UTF-8&gl=us&daddr=twin+falls&saddr=pocatello&panel=1&f=d&fb=1&dirflg=d&geo code=KQ2b0NUgT1VTMbA5zoQkagwH;Ka9ussWko6xUMarB-Czsd8sk&sa=X&ei=9oi NULOIBITa2AXtz4HADQ&ved=0CCAQ9w8wAA (last visited Oct. 28, 2012).

1216-17 (9th Cir. 2007).  The statute adopting much of Chapter 6, including the present § 18-608, contained a severability clause (1973 Idaho Sess. L. ch. 197, § 12), and the Idaho Supreme Court has held repeatedly that "when the unconstitutional portion of a statute is not integral or indispensable, it will recognize and give effect to a severability clause." *Simpson v. Cenarrusa*, 130 Idaho 609, 614, 944 P.2d 1372, 1377 (1997); *see also In re SRBA No. 39576*, 128 Idaho 246, 264, 912 P.2d 614, 632 (1995) ("[w]hen determining whether the remaining provisions in a statute can be severed from the unconstitutional sections, this Court will, when possible, recognize and give effect to the intent of the Legislature as expressed through a severability clause in the statute").  The Supreme Court additionally recognizes the propriety of severing a single word where "part of a statute or ordinance is unconstitutional and yet is not an integral or indispensable part of the measure, the invalid portion may be stricken without affecting the remainder of the statute or ordinance."  *Voyles v. City of Nampa*, 97 Idaho 597, 600, 548 P.2d 1217, 1220 (1976).

Here, severing the term "properly" and "satisfactory" would require first trimester abortions to be performed "in a hospital or in a physician's office . . . staffed and equipped for the performance of such procedures and respecting which the responsible physician or physicians have made . . . arrangements with one or more acute care hospitals within reasonable proximity thereof providing for the prompt availability of hospital care" in the event of complications or emergencies.  Severance of the two terms thus would leave the provision's fundamental objective—patient safety—in tact.  As a leading treatise has stated:

> Inasmuch as there is a strong preference expressed by legislatures and courts to sever unconstitutional portions of statutes, courts can find unconstitutional provisions nonseverable only if it is apparent that a legislature would not have enacted the statute without those provisions, or that after severance resulting parts of the statute would be incomplete and incapable of being executed in accordance with legislative intent.

Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction*

§ 44:4 (7th ed. 2007). The severance provision in the 1973 Session Laws Chapter 197 could not be plainer as to the Legislature's "preference," while physicians still would be under a legal duty to ensure that their offices were "staffed and equipped" to conduct abortions and to "have made arrangements" with a reasonably proximate hospital for emergencies. It thus cannot be said that "[t]here is nothing of substance in [the concluding sentence of § 18-608(1)] beyond the [terms 'properly' and 'satisfactory']." *Wasden v. State Bd. of Land Comm'rs*, 153 Idaho 190, 196, 280 P.3d 693, 699 (2012). Those words, in short, are not "integral or indispensable" to overall operation of the statute. *Boundary Backpackers v. Boundary County*, 128 Idaho 371, 378, 913 P.2d 1141, 1148 (1996).

**B.**   <u>Section 18-608(2)</u>

The data summarized earlier reflect that in calendar years 2010 and 2011 approximately 99 percent of medical abortions were performed in Idaho during the first nine weeks of pregnancy. That percentage remains virtually unchanged when the period is expanded to years 2007 through 2011. These data are consistent with medical abortion protocols endorsed by ACOG and NAF and with stated availability of such abortions at the Boise and Twin Falls Planned Parenthood facilities—all of which limit performance of medical abortions to, at most, the first nine weeks of pregnancy. They establish that the performance of medical abortions after the ninth week, much less after the first trimester, is an extraordinary occurrence. The data also establish that, for a "large fraction"—more than 99 percent—of women opting for medical abortions, § 18-608(2) has no relevance. Even if the remaining one percent is the relevant class, Hearn does not establish a factual basis for concluding that the omission of clinics from the provision causes *him* injury-in-fact for the reasons discussed below.

Hearn's challenge to § 18-608(2) fares no better under an as-applied analysis. Reduced to its essentials, he seeks the right to offer medical abortions to Bannock County residents during the second trimester from a location other than a hospital despite (1) the

absence of any showing that he has specialized competence in the performance of abortions or has arranged, or even could arrange, for the availability of a local physician with surgical abortion competence and a willingness to perform the procedure; (2) protocols from the preeminent obstetrical specialty group and an organization of abortion providers that limit such abortions to the first 63 days or less of pregnancy; (3) the virtual absence of reported medical abortions during the second trimester in Idaho generally; and (4) the absence of *any* showing concerning the likelihood of a Bannock County resident desiring a medical, as opposed to a surgical, abortion during the second trimester.  His reliance on *Akron* is misplaced because there the evidence reflected that ACOG and the American Public Health Association had reversed earlier positions and concluded that surgical abortions—then principally dilation and evacuation ("D & E")— could be performed, "at least during the early weeks of the second trimester[,]" as safely "in an outpatient clinic as in a full-service hospital."  462 U.S. at 437.  Given this record, the Court rejected the City's contention that the hospital-only requirement was a reasonable health regulation:

> By preventing the performance of D & E abortions in an appropriate nonhospital setting, Akron has imposed a heavy, and unnecessary, burden on women's access to a relatively inexpensive, otherwise accessible, and safe abortion procedure. [The requirement] has "the effect of inhibiting . . . the *vast majority* of abortions after the first 12 weeks," . . . and therefore unreasonably infringes upon a woman's constitutional right to obtain an abortion.

*Id.* at 438-39 (citation and footnote omitted; emphasis added).  The factual situation here is the converse—questions of Hearn's standing aside—because medical abortions after the thirteenth week of pregnancy are almost nil and no evidence establishes that the hospital-only requirement substantially burdens their availability.

Comparable questions of fact as to standing and the merits require denial of Hearn's motion with respect to PUCPA.  It nonetheless bears emphasis that the level of medical complexity attendant to abortions by medical induction increases with durational age, thereby requiring similarly greater experience and resources on the practitioner's

part.  *See* Dkt. 79-1 ¶ 8.  Hearn's qualifications to perform *any* medical abortion have not been shown, but they clearly are in dispute with respect to abortions after the nineteenth week of pregnancy.

## **CONCLUSION**

Plaintiffs' motion for partial summary judgment should be denied.

DATED this 9th day of November 2012.

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL


By_____*/s/ Clay R. Smith*_____
        CLAY R. SMITH
        Deputy Attorney General
        Attorney for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 9th day of November 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

John B. Ingelstrom               jbi@racinelaw.net
Richard A. Hearn                 rah@racinelaw.net
Jonathan M. Volyn                jmv@racinelaw.net
Jack Van Valkenburgh             jvanvalkenburgh@gmail.com


                                       */s/ Clay R. Smith*
                                       CLAY R. SMITH
                                       Deputy Attorney General