UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JENNIE LINN MCCORMACK, on
behalf of herself and all others similarly
situated, and in the interests of the
general public,

       Plaintiff,

and

RICHARD HEARN, M.D., on behalf of
himself and his patients seeking medical
abortions for health reasons prior to fetal
viability,

       Plaintiff-in-Intervention,

       v.

MARK L. HIEDEMAN, Bannock
County Prosecuting Attorney,

       Defendant.

Case No. 4:11-cv-00433-BLW

**MEMORANDUM DECISION AND
ORDER**

## INTRODUCTION

On May 18, 2011, Mark Hiedeman,[1] the Bannock County, Idaho prosecuting attorney, filed a felony criminal complaint against Jennie Linn McCormack. The complaint charged McCormack with "the public offense of Unlawful Abortion, Idaho Code § 18-606," which makes it a felony for any woman to undergo an abortion in a manner not authorized by statute. As a result, McCormack faced the possibility of up to five years' imprisonment for allegedly violating section 18-606, Idaho Code, which specifically targets pregnant women.  I.C. § 18-606(2). On September 7, 2011, an Idaho state district court dismissed the criminal complaint without prejudice.

On September 16, 2011, McCormack filed this class action against Hiedeman, seeking a determination that section 18-606, as well as other provisions of Title 18, Chapters 5 and 6 of the Idaho Code, which also regulate abortion, violate various provisions of the United States Constitution.  McCormack also filed a motion to enjoin enforcement of these various statues.  On November 14, 2011, this Court issued a preliminary injunction that enjoined Hiedeman from enforcing sections 18-606 and 18-608(1), but found that McCormack did not have standing to challenge either section 18-

--------

[1] On February 11, 2013, Stephen Herzog substituted for Mark Hiedeman as defendant after Mr. Herzog assumed the Office of Bannock County prosecutor on January 14, 2013. Because Mr. Hiedeman was the prosecutor at the time the parties filed their motions for summary judgment, the Court refers to Mr. Hiedeman throughout this decision. However, all future pleadings will reference Mr. Herzog.

608(2), or any provision of Chapter 5, the Pain-Capable Unborn Child Protection Act ("PUCPA").

Both McCormack and Hiedeman appealed the decision.  The Ninth Circuit affirmed in part and reversed in part this Court's grant of a preliminary injunction, concluding that (1) McCormack will likely succeed with her facial constitutional challenge to sections 18-606 and 18-608(1); (2) McCormack has standing to challenge section 18-608(2) in conjunction with section 18-606; (3) this Court's injunction was overbroad to the extent it granted relief beyond McCormack, and (4) McCormack does not have standing to challenge enforcement of the PUCPA.

Hiedeman now moves for partial summary judgment (Dkt. 58), arguing McCormack's claims are moot because he has decided that he will not re-file the charges against McCormack.  McCormack and Plaintiff-in-Intervention Dr. Richard Hearn also filed a joint motion for partial summary judgment on their claims for prospective relief (Dkt. 71), seeking: (a) a declaration that section 18-606, Idaho Code, in conjunction with sections 18-608(1) and 18-608(2), Idaho Code, is facially unconstitutional; (b) a declaration that section 18-605, Idaho Code, in conjunction with sections 18-608(1) and 18-608(2), Idaho Code, is facially unconstitutional; (c) a declaration that section 18-505, Idaho Code, in conjunction with sections 18-507 and 18-508, Idaho Code,  is facially unconstitutional; and (d) a permanent injunction against Hiedeman from enforcing any of these statutes.

For the reasons set forth below, the Court will deny Hiedeman's motion for partial summary judgment. McCormack's claims are not moot. And the Court grants Plaintiff's partial motion for summary judgment for the reasons set forth below.

## LEGAL STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id.* at 248.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Direct testimony of the non-movant must be believed, however implausible. *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999). On the other hand, the Court is not required to adopt

unreasonable inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

The moving party bears the initial burden of demonstrating the absence of a genuine dispute as to material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)(en banc).  To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 532 (9th Cir.2000).

This shifts the burden to the non-moving party to produce evidence sufficient to support a jury verdict in her favor. *Deveraux*, 263 F.3d at 1076.  The non-moving party must go beyond the pleadings and show "by her [ ] affidavits, or by the depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex,* 477 U.S. at 324.

However, the Court is "not required to comb through the record to find some reason to deny a motion for summary judgment." *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir. 2001) (quotation omitted).   Instead, the "party opposing summary judgment must direct [the Court's] attention to specific triable facts." *Southern California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 889 (9th Cir. 2003).

# BACKGROUND

## 1.  The Statutes

### A.  *Chapter 6*

Section 18–606(2), Idaho Code, focuses on women seeking abortions. Section 18-606(2) makes it a felony, except as permitted by the remainder of Title 18, Chapter 6 of the Idaho Code, for "[e]very woman who knowingly submits to an abortion or solicits of another, for herself, the production of an abortion, or who purposely terminates her own pregnancy otherwise than by live birth." Section 18–608 entitled "Certain abortions permitted—Conditions and guidelines" limits the applicability of section 18–606.

For example, section 18-608(1) allows a woman to terminate her pregnancy during the first trimester if and when the abortion is performed by a physician "in a hospital [ . . . ] or a clinic [that is] properly staffed and equipped for the performance of such procedures," if the physician makes arrangements with a nearby hospital that could provide prompt care if a medical emergency were to arise. I.C. § 18–608(1).

Additionally, under section 18–608(2), a woman may terminate her pregnancy during the second trimester of pregnancy, but the abortion must be "performed in a hospital and [must be], in the judgment of the attending physician, in the best medical interest of such pregnant woman." I.C. § 18-608(2).

Finally, section 18-605(3) applies to health care providers, making it a felony for any licensed or certified health care provider to knowingly violate any provision of Chapter 6. I.C. § 18-605(3).

**B. *Chapter 5***

Title 18, Chapter 5 of the Idaho Code, or the PUCPA, categorically bans non-therapeutic abortions at and after twenty weeks. I.C. § 18–505. "Any person who intentionally or recklessly performs or attempts to perform an abortion in violation of the provisions of section 18–505, Idaho Code, is guilty of a felony." I.C. § 18–507. The PUCPA also provides civil remedies in the form of actual damages to "[a]ny woman upon whom an abortion has been performed in violation of the pain-capable unborn child protection act or the father of the unborn child . . . ." I.C. § 18–508(1). In addition, the PUCPA permits certain persons, including a prosecuting attorney, to file an action for injunctive relief against an abortion provider who violates section 18–505. I.C. § 18–508(2).

**2. Jennie Linn McCormack**

McCormack is a resident of Bannock County, Idaho. In 2010, she was unmarried, had three children (ages 2, 11, and 18), and was unemployed. She also had no source of income other than child support payments, which were between $200 and $250 per month.

In the fall of 2010, McCormack discovered she was pregnant and sought an abortion. She knew that abortions are not available in southeast Idaho. In fact, there are

no licensed health care providers offering abortion services in the eight southeastern Idaho counties. McCormack knew that abortions are available in Salt Lake City, Utah, but at costs between $400 – $2,000, depending on how far along the pregnancy is.

But McCormack found out that abortions could be performed in Idaho using medications, rather than surgery, and that the cost of such medical abortions was significantly less than the cost of a surgical abortion like those offered in Salt Lake City, Utah. She learned further that medications that induce abortions have been approved for use in the U.S. and could be purchased over the internet.

According to a Pocatello Police Department's detail incident report, a police officer, on January 9, 2011, responded to a call from a third party that McCormack "had taken drugs to abort a pregnancy and now had the fetus in a box on her back porch." *Incident Report* at 5, Ex. A to Counsel Aff. III, Dkt. 21-1. After receiving that call, police officers questioned McCormack at her home. *Id.* While being questioned, McCormack voluntarily led the police officers to the remains of a fetus. *Id.* at 3, 10.

After the officers discovered the fetus, McCormack agreed to accompany them to the police station to answer additional questions. *Id.* at 7. According to the Incident Report, McCormack had ingested five pills to abort the fetus because she did not have enough money to travel to Salt Lake City to get an abortion. *Id.* McCormack stated that her sister, who lived in Mississippi, had ordered the pills from an internet provider for $200, and they arrived at McCormack's apartment approximately one week later. *Id.* at 7, 8.

An autopsy was performed on the fetus, which appeared to be female, two days after discovery by the police.  An attending physician estimated gestational age at 19 to 23 weeks "but with difficult certainty." *Id.* at 19. McCormack stated that she did not know when she conceived as her periods were irregular, but she placed the gestational age at various points, including four weeks, 12 weeks, 14 weeks, and 25 weeks. *Id.* at 16, 19, 5, and 8.

On May 18, 2011, Hiedeman, in his capacity as Bannock County prosecuting attorney, filed a criminal complaint in state court in Bannock County, charging McCormack with the felony of "the public offense of Unlawful Abortion, Idaho Code § 18-606." The criminal complaint alleged that on December 24, 2010, McCormack induced her own abortion, thereby purposefully terminating her pregnancy:

> That the said JENNIE LINN MCCORMACK, in the County of Bannock, State of Idaho, on the 24th day of December, 2010, did induce or knowingly aid in the production or performance of an abortion by knowingly submitting to an abortion and/or soliciting of another, for herself, the production of an abortion; and/or who purposely terminated her own pregnancy other than by live birth.

A state magistrate judge dismissed the criminal complaint without prejudice on September 7, 2011.

At the time McCormack sought the preliminary injunction, Hiedeman had not determined whether to re-file the criminal complaint. He now says that he does not intend to prosecute McCormack for an unlawful abortion because "it is not in the interests of justice or an efficient use of [his] office's limited resources." *Third Hiedeman Decl.*¶ 5, Dkt. 58-2.

McCormack does not want to have additional children. If she were to become pregnant again, she would again seek an abortion.. Because there are no providers of medical abortions in southeast Idaho, McCormack would hypothetically need to seek the assistance of providers of abortion services outside of southeast Idaho.

### 3.  Dr. Hearn and His Plan to Perform Medical Abortions in Bannock County

Plaintiff-in-Intervention Dr. Hearn is a physician licensed in Idaho. *Answer to Amended Complaint-in-Intervention* ¶ 5 ("Paragraphs 9 through 12 are admitted."), Dkt. 56.  Since 1997, Dr. Hearn has continuously been registered with the Federal Drug Enforcement Agency ("DEA") and the Idaho State Board of Pharmacy. *Id.* As an Idaho licensed physician registered with the DEA and the Idaho State Board of Pharmacy, Dr. Hearn may legally prescribe medication to women in Bannock County. *Id.*

In the early stage of pregnancy, physicians who provide abortion services often prescribe FDA-approved medications that cause a pregnancy to be terminated medically, or non-surgically, outside of a clinical setting.  These medical abortions generally cost less than surgical abortions and are at least as safe.  *Id.* ¶ 10.

Among those FDA-approved medications that induce medical abortions are mifepristone and misoprostol. The two work in tandem to induce a medical abortion: first, six-hundred milligrams of mifepristone are administered orally, followed by, 48 hours later, 400 micrograms of misoprostol. *Medical Management of Abortion, ACOG Practice Bulletin* ("*ACOG Bulletin*"), No. 67, October 2005 (Reaffirmed 2011) at 2, Ex. A to Counsel Aff., Dkt. 71-2.   The FDA initially approved this mifepristone-misoprostol

protocol for use through 49 days of gestation, calculated from the woman's last menstrual period ("LMP"). *Id.*

Following FDA approval, additional clinical trials led to the development of mifepristone-misoprostol regimens that differ from the FDA-approved protocol. These new regimens reduce side effects, and make medical abortions cheaper, safer, and faster. *Id.* These regimens are recommended for use up to and until the sixty-third day of gestation, based on the LMP. The medical community recognizes off-label, non-FDA-approved alternatives to mifepristone-misoprostol regimens, two of which include combining methotrexate and misoprostol, or simply taking misoprostol alone.

After the FDA approves a drug for use, and absent any state regulation to the contrary, doctors may prescribe that drug for indications, in dosages, and following treatment protocols different than those expressly approved by the FDA. This practice is commonly known as "off-label" use. The off-label use of drugs approved by the FDA does not violate federal law or federal regulations, because the FDA regulates the marketing and distribution of drugs, not the practice of medicine. *Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350  (2001) (citing Beck &Azari, FDA, Off-Label Use, and Informed Consent: Debunking Myths and Misconceptions, 53 Food & Drug L.J. 71, 76-77 (1998) (noting that courts, several states, and the "FDA itself recognize the value and propriety of off-label use.") The medical community recognizes off-label, non-FDA-approved alternatives to mifepristone-misoprostol regimens, two of which include combining methotrexate and misoprostol, or simply taking misoprostol alone.

**MEMORANDUM DECISION AND ORDER - 11**

Whether using the FDA-approved method or one of the recognized off-label alternatives, the delivery of the fetus occurs at home with hospitalization necessary only in emergencies. *Id.* at 2-4.

Dr. Hearn has stated his clear intention to prescribe FDA-approved medication to women in Bannock County, such as McCormack and other similarly situated women who, for health reasons, seek to medically terminate their pregnancies prior to fetal viability outside a clinical setting. *Amended Complaint-in-Intervention* ¶ 10, Dkt. 56. As a currently licensed physician holding both a DEA and Idaho State Board of Pharmacy registration, Dr. Hearn may legally prescribe FDA-approved medication that induces abortions outside of clinical settings. *Id.* at 2-4.

Dr. Hearn does not say he has performed medical abortions in the past. He has practiced as a full-time attorney since 1997, and he has no medical office where he could provide medical treatment to patients. When he practiced medicine full-time, he specialized in nephrology and rheumatology.

## ANALYSIS

### 1. McCormack's Claims Are Not Moot.

Article III of the Constitution grants the Judicial Branch authority to adjudicate "Cases" and "Controversies." But courts have "no business" deciding legal disputes or expounding on law in the absence of such a case or controversy. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 341 (2006). An "actual controversy" must not only exist at the beginning of the case but through "all stages" of the litigation. *Alvarez* v. *Smith*, 558 U.S.

87, 92 (2009). The mootness doctrine therefore requires a federal court to refrain from deciding a case if events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future. *City of Erie v. Pap's A.M.* 529 U.S. 277, 287 (2000).

Merely stopping the complained of conduct ordinarily is not enough, however, to establish mootness: "a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (internal quotation marks and citation omitted). "If it did, the courts would be compelled to leave the defendant free to return to his old ways." *Id.* Given this concern, the United States Supreme Court has explained that "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*

The repeal of a specific law challenged by a plaintiff usually moots a case because the likelihood that the government will drop the new policy and revert to its older regulations is remote, at best. *See, e.g., Native Village of Noatak v. Blatchford*, 38 F.3d 1505, 1510 (9th Cir. 1994). Complete and tangible satisfaction of the relief sought by a plaintiff provides a similarly firm basis for deeming a case moot. *See, e.g., Troiano v. Supervisor of Elections in Palm Beach*, 382 F.3d 1276, 1283 (11th Cir. 2004).

On the other hand, a party cannot conjure up mootness by ceasing the challenged conduct only for practical or strategic reasons – such as avoiding litigation. *United States*

*v. W.T. Grant Co*., 345 U.S. 629, 632, n.5 (1953); *see also Harrell v. The Florida Bar*, 608 F.3d 1241, 1266 (11th Cir. 2010) (circumstances suggesting defendant "changed course simply to deprive the court of jurisdiction" prevented court from finding controversy moot).  Courts also hesitate to find a case moot when a party voluntarily ceases the challenged conduct but continues to argue the lawfulness of the challenged conduct. *See, e.g., Olagues v. Russoniello,*770 F.2d 791, 794-95 (9th Cir. 1985).

*Olagues* illustrates this latter point. In *Olagues*, the plaintiffs sought to enjoin an investigation by the United States Attorney.  The United States Attorney terminated the investigation, but the Ninth Circuit found the termination did not moot the case.  Several factors pointed towards the continued existence of a live controversy: (1) the U.S. Attorney did not voluntarily terminate the investigation because he believed it was unlawful but because it failed to produce evidence supporting further investigative activities; (2) the U.S. Attorney made no showing that a similar investigation against the same groups could or would not recur; and (3) there was a strong public interest in determining the legality of such investigations.  *Id.* at 795.

At the outset of this litigation, McCormack had standing to challenge the constitutionality of section 18-606 in conjunction with both section 18-608(1) and section 18-608(2).  She had standing to challenge these provisions because she faced prosecution and continued to be threatened with prosecution under these provisions.  But then Hiedeman decided not to prosecute McCormack, and he signed a transactional immunity agreement promising that his office would never prosecute McCormack for her past

abortion.  Hiedeman's actions call into question the existence of a continuing case or controversy.

If Hiedeman merely promised not to prosecute McCormack for her past conduct, he would not meet the burden imposed by the voluntary cessation test.  Hiedeman never repudiated the statute as unconstitutional, and he did not cease McCormack's prosecution because he believed the prosecution was unlawful. Instead, he stopped the prosecution because it would waste his office's resources and would not be "in the interests of justice."  And he only ceased his prosecutorial efforts after he lost his Ninth Circuit appeal, which fairly leaves open the possibility that he changed course to deprive the Court of jurisdiction.  Most importantly, Hiedeman's promise not to prosecute, with nothing more, would not bind his successors.  These facts do not make it "absolutely clear" that the prosecution against McCormack would never recur.  *See Olagues*, 770 F.2d at 794-95; *Harrell*, 608 F.3d at 1266.

But Hiedeman signed a transactional immunity agreement on October 26, 2012.[2] *Agreement* pg. 2, ¶ 3, Dkt. 77-1. In this agreement, the "State of Idaho agree[d] to bring no further charges against [McCormack] in connection with the matters giving rise to the Criminal Complaint [ . . . ]or arising from any information learned during the participation of this agreement concerning the facts, circumstances or events attendant to

---

[2] Transactional immunity is full immunity from prosecution for any offense to which the testimony relates. *Kastigar v. United States*, 406 U.S. 441, 453 (1972). The Court assumes, but does not decide, that the agreement is a transactional immunity agreement.

the criminal offense alleged in such Complaint." *Id*. pg. 4, ¶ 2, Dkt. 77-1.  The

Agreement purports to bind the "State of Idaho," which presumably would include the

Attorney General's office. Hiedeman argues that this agreement trumps all other factors.

The Court disagrees.

Agreements to exchange cooperation for transactional immunity are generally

governed by traditional principles of contract law.  *U.S. v. Carrillo*, 709 F.2d 35, 36 (9th

Cir. 1983).  Here, enough questions regarding the validity of the agreement exist to

significantly undermine its impact on the mootness question.

McCormack never signed the agreement, and Hiedeman presents no evidence that

McCormack provided any consideration in exchange for immunity.  An immunity

agreement, like any contract, requires consideration. Usually a prosecutor will grant an

individual immunity in exchange for her cooperation.  The Court does not know what, if

anything, McCormack gave the prosecutor in exchange for the offer of immunity.  In

fact, the agreement is dated October 26, 2012 – months after Hiedeman filed his motion

for partial summary judgment arguing McCormack's claims are moot.  The timing of the

agreement suggests that Hiedeman may have offered immunity simply to moot

McCormack's claims and thereby avoid this litigation – and its challenge to the

constitutionality of sections 18-606 and -608.  This calls into question whether the

unsigned grant of transactional immunity is a binding, judicially enforceable agreement.

Other factors also suggest a live controversy. The specific relief requested in the

amended complaint remains available and unaffected by Hiedeman's decision not to

prosecute: a declaration that section 18-606 in conjunction with sections 18-608(1) and 18-608(2) is facially unconstitutional. McCormack continues to assert that the provisions are unconstitutional and Hiedeman continues to assert that they are not.  There is a significant public interest in settling the legality of these provisions, and the existence of this interest "militates against a mootness conclusion."  *Olagues*, 770 F.2d at 794-95 (quoting *W.T. Grant*, 345 U.S. at 632).

The mootness doctrine in general, and the voluntary cessation exception in particular, are underscored by the principle that "[o]nce a defendant has engaged in conduct the plaintiff contends is unlawful and the courts have devoted resources to determining the dispute, there is Article III jurisdiction to decide the case as long as the parties do not plainly lack a continuing interest . . . ." *See Demery v. Arpaio*, 378 F.3d 1020, 1026 (9th Cir. 2004).  The Court cannot say that McCormack plainly lacks a continuing interest in this lawsuit. Accordingly, McCormack's claims are not moot.

This conclusion is bolstered by the application of another exception to the mootness doctrine—the "capable of repetition yet evading review" exception.  Although McCormack was not pregnant when this litigation began, pregnancy is nonetheless a significant fact in this case: she faced prosecution for terminating her pregnancy. Cases involving pregnancy present controversies of inherently limited duration. And, "[p]regnancy often comes more than once to the same woman, and in the general population, if man is to survive, it will always be with us." *Roe v. Wade* 410 U.S. 113, 125 (1973).  Therefore, this case – even if it does not fit the usual mold of cases

challenging abortion laws –  presents "a classic justification for a conclusion of nonmootness." *Id.* at 125.  As with all controversies involving pregnancy and abortion laws, "[i]t truly could be 'capable of repetition, yet evading review.'" *Id.*

Hiedeman, however, argues that McCormack cannot rely on the "capable of repetition, yet evading review" exception "because she lacks standing to challenge section 18-606 on the basis of future pregnancies." *Def.'s Reply* at 3, Dkt. 63.  But mootness is not simply "standing in a time frame." *Friends of the Earth*, 527 U.S. at 190-91. Otherwise the "capable of repetition, yet evading review" exception could not exist. *Id.*  So the question the Court must ask is not whether McCormack has standing based on future pregnancies, but rather (1) whether she, like any other woman challenging an abortion law, may become pregnant more than once, and (2) whether her full-term pregnancies, like any other woman's, last only 266 days. *Roe¸* 410 U.S. at 125. If the answers are yes – which they are – McCormack's claims are capable of repetition, yet evading review.

**2. Dr. Hearn Has Standing.**

Even if McCormack's claims were moot, this case would live on because Dr. Hearn not only has standing to raise each of his challenges to those provisions that apply to physicians, but he also has third-party standing to assert his patients' constitutional rights.

Article III standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast v. Cohen,* 392

U.S. 83, 99 (1968).  To establish standing under Article III, Hearn must establish that: (1) he personally has suffered some actual or threatened injury as a result of the allegedly illegal conduct; (2) the injury fairly can be traced to the challenged action; and (3) the injury is likely to be redressed by a favorable decision by the federal court. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc*., 454 U.S. 464, 472 (1982).  Or, as the Supreme Court has explained: "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

The Ninth Circuit has held that physicians who state a clear intention to perform abortions for their patients allege "a sufficiently concrete and imminent injury– possible prosecution and imprisonment" to challenge statutes that regulate abortion providers: "Whether [a physician] continues to perform abortions subject to the statute, desists from performing them to avoid the statute's penalties, or violates the statute so as to practice his profession in accord with his medical judgment, his liberty will be concretely affected."  *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 917 (9th Cir. 2004).  This is true, according to the Ninth Circuit, even if the physician does not express a specific intent to violate the statute. *Id.*

For purposes of this case, the Court accepts as true and established, that Hearn would prescribe FDA-approved medication to women seeking pre-viability medical abortions through the second trimester but for Idaho's criminal abortion laws.  As an

Idaho-licensed physician thwarted by those statutes, Hearn has standing to challenge them.

At oral argument, counsel for Hiedeman suggested that Hearn, unlike a physician who regularly performs abortions, cannot establish standing by merely stating his intention to perform medical abortions in the future.  Hearn has not practiced medicine regularly since 1997, he has never specialized in obstetrics or gynecology, he currently has no medical office to treat patients, and to the Court's knowledge, he has not performed abortions in the past.  Because Hearn has no history of performing abortions and he has no medical office, argues Hiedeman, Hearn must show that he can comply with Idaho's statutory requirements for performing abortions. That is, Hiedeman contends that Hearn must have, a properly equipped and staffed clinic or office and sufficient arrangements for emergency care in the case of a first trimester abortion, I.C. § 18-608(1), or privileges at a hospital for a second trimester abortion, I.C. § 18-608(2), before he has standing to challenge these provisions.

Hiedeman's argument that Hearn must comply with Idaho's abortion laws before he can challenge them fundamentally misapprehends the applicable inquiry and generally settled Supreme Court precedent on standing, particularly in abortion cases.  First, a plaintiff contesting the constitutionality of a criminal statute is not required to "first expose himself to actual arrest or prosecution to be entitled to challenge [the] statute that he claims deters the exercise of his constitutional rights." *Steffel v. Thompson*, 415 U.S. 452, 459 (1974). Second, in limited circumstances, litigants are entitled to predicate

injury on the existence of a statute that results in more than a "subjective chill" on the exercise of constitutionally protected rights, even when arrest and prosecution do not occur. *See Meese v. Keene*, 481 U.S. 465, 472–73 (1987).

Both sorts of injury are, of course, related because both hinge on the existence of a credible threat that the challenged law will be enforced against the plaintiff. In the context of a pre-enforcement challenge to a criminal statute, the standard set forth in the Supreme Court's decision in *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289 (1979), incorporates and recognizes both types of injury. *Babbitt* held that, to satisfy Article III's injury requirement, the plaintiff must allege "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute," and that "there exists a credible threat of prosecution thereunder." *Id.* at 298.  A credible threat must be both real and immediate, not merely conjectural or hypothetical. *See id.*

The Supreme Court has emphasized, however, that "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." *Babbitt*, 442 U.S. at 298. Also, in the abortion context, the Ninth Circuit's decisions teach that the existence of an abortion regulation aimed at physicians that would prevent or chill a pregnant woman from seeking an abortion she would otherwise seek is sufficient to satisfy the injury requirement. *Wasden*, 376 F.3d at 917.

In this case, the injury requirement is satisfied both by a credible threat of prosecution and a potential chilling effect on Hearn's medical practice.   Hearn has stated, under oath, that he would perform medical abortions outside a clinical or hospital setting *through the second trimester* – but for the fear of prosecution. Hearn is both willing to prescribe and capable of prescribing the FDA-approved medication necessary to induce a medical abortion through the second trimester, and while medical abortions are rare in the second trimester, they do happen.   Idaho's criminal abortion laws facially restrict the type of abortion Hearn wishes to perform, and the county prosecutor's office has not disavowed its intention to enforce these laws against physicians, such as Hearn, who might violate those laws.   So if Hearn followed through with his plan to prescribe FDA-approved medication to women seeking abortions outside a hospital or clinic, he could face prosecution. Whether Hearn decides to perform medical abortions subject to the statute, opts to not perform medical abortions to avoid the statute's penalties, or violates the statute so as to practice his profession in accordance with his medical judgment, his liberty is concretely affected.  *Id*.

Given that Hearn faces the threat of prosecution for performing medical abortions, it makes little sense to suggest that Hearn must first comply with those laws before he has standing to challenge them. This argument conflates standing with a review of the merits. Hearn, in his medical judgment, believes he could safely prescribe the FDA-approved medication necessary to induce a medical abortion outside a "properly equipped and staffed" office or clinic and without making "satisfactory" arrangements for emergency

care within a reasonable proximity of that office or clinic for a first trimester abortion, or outside a hospital setting for a second trimester abortion  –  and he has stated his desire to do so.  This is enough to establish standing.  *Id*. (citing *California Pro-Life Council, Inc. v. Getman*, 328 F.3d 1088, 1094-95 (9th Cir. 2003) (allowing a challenge where plaintiff had a reasonable fear a statute would be enforced against it if it engaged in certain conduct).

In addition, Hearn has third party standing to assert the rights of his women patients.  *Id*.  As a prudential matter, even when a plaintiff has Article III standing, courts ordinarily do not allow third parties to litigate on the basis of the rights of others.  *Id.* Physicians, however, may acquire third-party standing "to assert their patients' due process rights in facial challenges to abortion laws."  *Id.* The Court will therefore consider the additional constitutional arguments Hearn raises on his patients' behalf.  *Id.*

**3.  The Statutes Place an Undue Burden on a Woman's Right to Have an Abortion, and Its Criminal Sanctions for Abortion Providers is Unconstitutionally Vague.**

Plaintiffs' challenge to the abortion statutes in question focuses on their purported infringement on the constitutional right to choose an abortion, first enunciated in *Roe v. Wade*, 410 U.S. 113 (1973), and more recently refined in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992).

In *Roe*, the Supreme Court held that a pregnant woman has a constitutional right, under the Due Process Clause of the Fourteenth Amendment, to choose to terminate her pregnancy before viability.  410 U.S. at 152-66.  In *Casey*, the Supreme Court upheld

*Roe's* "essential holding" by reaffirming "the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." 505 U.S. at 846. The Court in *Casey* also clarified that the right to obtain an abortion is not absolute and that state interests in maternal health and protecting fetal life can, in some circumstances, justify regulations of abortion. *Id*. at 846. *Casey*, however, jettisoned *Roe's* trimester framework of analysis for determining the validity of an abortion regulation, and replaced it with an undue burden standard.

In *Casey*, the Court asked whether a law designed to further the State's interest in fetal life, but which imposed an undue burden on the woman's decision before fetal viability, could be constitutional. *Id.* at 877. It answered this question "no." *Id.* The plurality opinion contained a summary of its salient points, which is useful for the issues presented here:

- An undue burden exists, and therefore a provision of law is invalid, if its purpose or effect is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus obtains viability.

- To promote the state's profound interest in potential life, throughout pregnancy the state may take measures to ensure that the woman's choice is informed, and measures designed to advance this interest will not be invalidated as long as their purpose is to persuade the woman to choose childbirth over abortion. However, these measures must not be an undue burden on the right to have an abortion.

- As with any medical procedure, the state may enact regulations to further the health or safety of a woman seeking an abortion. Unnecessary health regulations that have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion impose an undue burden on the constitutionally protected right to choose.

- Regardless of whether exceptions are made for particular circumstances, a state may not prohibit any woman from making the ultimate decision to terminate her pregnancy before viability.

- Subsequent to viability, and in promoting its interest in the potentiality of human life, the state may regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.

*Id.* at 878–79 (citation omitted). The plurality explained that "[a] finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.* at 877.

Against this background, the Court will consider the constitutionality of sections 18-605, -606, and -608, Idaho Code.

### A. *Title 18, Chapter 6*

Plaintiffs ask this Court to declare unconstitutional section 18-605, Idaho Code, (criminalizing physicians performing abortions) and section 18-606, Idaho Code,

(criminalizing women submitting to abortions) in conjunction with either section 18-608(1), Idaho Code, (first trimester abortions) or section 18-608(2), Idaho Code, (second trimester abortions).  Plaintiffs argue that threatened enforcement of these statutes places an undue burden on the right of women in Bannock County to choose to have a pre-viability abortion.

### (1) Section 18-606 in Conjunction With Section 18-608(1) or Section 18-608(2).

In an appeal in this case, the Ninth Circuit held that section 18-606 "constitutes a substantial obstacle in the path of women seeking an abortion of a nonviable fetus." *McCormack v. Hiedeman*, 694 F.3d 1004, 1015 (9th Cir. 2012).  This Court adopts the Ninth Circuit's reasoning as detailed below.

Section 18-606 subjects a woman to felony charges for obtaining an abortion unless she obtains the abortion from a physician according to statutory requirements.  I.C. § 18-606.  Historically, abortion statutes sought to protect pregnant females from third parties providing dangerous abortions. *McCormack*, 694 F.3d at 1011.  As a result, most states' abortion laws traditionally criminalized the behavior of third parties to protect the health of pregnant women –  they did not punish women for obtaining an abortion.  *Id.*  By punishing women, Idaho's abortion statute is therefore unusual.

Section 18-608 (1) requires all first trimester abortions to be performed by a physician in the physician's "properly staffed and equipped" office or clinic.  I.C. § 18-608(1). This section further requires the responsible physician to make "satisfactory arrangements with one or more acute care hospitals within reasonable proximity," to

ensure that prompt hospital care is available in the case of complications or emergencies.
*Id.* Section 18-608(2) applies to second trimester abortions and requires that all second trimester abortions be performed in a hospital. *Id.*

According to the Ninth Circuit, section 18-606 places "an undue burden on women seeking abortions by requiring them to police their provider's compliance with Idaho's regulations." *McCormack*, 694 F.3d at 1015. As noted by the Ninth Circuit, if a woman knowingly obtains a first trimester abortion, but fails to ensure the physician has complied with Idaho's regulations, she faces felony charges and up to five years' imprisonment. I.C. § 18-608(1). Likewise, if a woman obtains a second trimester abortion, but the physician does not alert her that the procedure will occur in a clinic rather than a hospital, she faces felony charges and five years' imprisonment. *Id.* at § 18-608(2). "Or, as is the case here, if a woman elects to take physician prescribed pills obtained over the internet to end her pregnancy, which is not authorized by statute, she is subject to felony charges." *McCormack*, 694 F.3d at 1015 (citing I.C.§§ 18–608(1)–18–608(3)).

"There can be no doubt," the Ninth Circuit explained, "that requiring women to explore the intricacies of state abortion statutes to ensure that they and their provider act within the Idaho abortion statute framework, results in an 'undue burden' on a woman seeking an abortion of a nonviable fetus." *Id.* at 1016. The Ninth Circuit faulted the Idaho statutes for heaping "yet another substantial obstacle in the already overburdened

path that McCormack and pregnant women like her face when deciding whether to obtain an abortion." *Id.*

The Circuit further observed that many low-income women living in rural areas, such as McCormack, must "grapple with the cost of the abortion itself as well as the long-term financial implications of not having one." *Id.* at 1017.  These women often must travel long distances to the closest abortion provider, requiring an already financially strapped pregnant woman to miss work, find childcare, make arrangements for travel and for an overnight stay to satisfy the 24-hour requirement. *Id.*  These obstacles, coupled with the threat of criminal prosecution based on an abortion provider's purported failure to comply with state abortion regulations, are simply too much. *Id.* "While the Supreme Court has permitted many restrictions that make obtaining an abortion more difficult, particularly for low-income women, [citing *Casey*, 505 U.S. at 886–87], it has not authorized the criminal prosecution of women seeking abortion care." *Id.* at 1018.  In accordance with the Ninth Circuit's recent decision in *McCormack*, this Court therefore finds that section 18-606 constitutes an undue burden on a woman's constitutional right to terminate her pregnancy before viability.  *Id.*

Hiedeman criticizes the Ninth Circuit decision because it ignores the "knowingly" requirement under section 18-606(2).  But as Hiedeman acknowledges, "knowingly" refers to submitting to or performing an abortion – not knowing that the abortion violated the law because the woman's physician failed to comply with the requirements of section 18-606(1) or section 18-606(2).  The insertion of the "knowingly" requirement therefore

does nothing to ameliorate the obligation – and burden – that the statute imposes on women to police their provider's conduct.

### (2) Section 18-605 in Conjunction With Section 18-608(1)

The constitutionality of section 18-605, which imposes criminal liability on abortion providers who perform first trimester abortions outside a clinic or office setting, presents a closer question.  As noted above, section 18-608(1) requires that all first trimester abortions be performed in a hospital or in a "properly staffed and equipped" office or a clinic. I.C. § 18-608(1).  The section further requires that "physicians have made *satisfactory* arrangements" for emergency hospital care. *Id.* (emphasis added). Dr. Hearn argues that the terms "properly" and "satisfactory" are unconstitutionally vague, therefore placing an undue burden on women seeking first trimester abortions.

"[A]s a matter of due process, a criminal statute that 'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,' or is so indefinite that 'it encourages arbitrary and erratic arrests and convictions,' is void for vagueness." *Colautti v. Franklin*, 439 U.S. 379, 390 (1979) (internal citations omitted). Standardless laws and regulations pose an especially acute danger of arbitrary enforcement in the context of abortion –  "a constitutionally protected right that has been a traditional target of hostility." *Women's Medical Center of Northwest Houston v. Bell* 248 F.3d 411, 422 (5th Cir. 2001).  Given the potential harassment that abortion providers face, it is particularly important that enforcement of any

unconstitutionally vague abortion laws be enjoined.  *Tucson Woman's Clinic v. Eden*, 379

F.3d 531, 554 (9th Cir. 2004)

Also, "[i]f a statute subjects transgressors to criminal penalties, as this one does,

vagueness review is even more exacting." *Forbes v. Napolitano*, 236 F.3d 1009, 1011

(9th Cir. 2000).  This is particularly true "where the uncertainty induced by the statute

threatens to inhibit the exercise of constitutionally protected rights." *Colautti v. Franklin*,

439 U.S. 379, 388-89 (1979).  Failure to satisfy the more stringent standard in cases

where constitutional rights or criminal penalties are involved necessitates a finding that

the law is unconstitutionally vague. *Id.* at 391. This is true even though the law could

conceivably have some constitutional applications. *Id.*

In *Gonzales v. Carhart*, 550 U.S. 124 (2007), the Supreme Court examined

whether a Nebraska statute banning "partial birth abortions" was unconstitutionally

vague.  The Act defined "the unlawful abortion in explicit terms," including providing

very specific "anatomical landmarks" in its definition of "partial birth abortion."  *Id.* at

147-48.  The Court found the Act provided "doctors of ordinary intelligence a reasonable

opportunity to know what is prohibited" by setting forth "relatively clear guidelines as to

prohibited conduct" and providing "objective criteria to evaluate whether a doctor has

performed a prohibited procedure." *Id.* at 149.  The Court contrasted the Nebraska Act in

*Gonzales* with another state's act, which banned partial birth abortions that prohibited the

delivery of a "substantial portion" of the fetus. *Id.*  The Court viewed the term

"substantial" as vague, especially when contrasted with the "anatomical landmarks" set forth in the Nebraska statute.

In this case, like the term "substantial," the terms "properly" and "satisfactory" are ambiguous terms that lack a precise definition. These terms are not defined in the statute, and they are not medical terms of art. And their dictionary definitions do not provide any guidance. "Properly" means "suitably, fitly, rightly, correctly." WEBSTER'S THIRD INT'L DICTIONARY 1818 (3d ed.1976). "Satisfactory" means "sufficient to meet a condition or obligation." *Id.* at 2017. Both these definitions, rather than being helpful, only raise the question: suitable or fit or right or sufficient according to whom or what? Different physicians in different communities may have different answers to that question, leading a doctor to question what is "proper" or "satisfactory."

Unlike the sufficiently definite statute in *Gonzales*, which specified anatomical landmarks in defining partial birth abortion, section 18-608(1) contains no similarly defined landmark to judge what is "proper" or "satisfactory." The vagueness of section 18-608(1), because it fails to define "properly" or "satisfactory" or otherwise anchor terms to any medical or legal standard, lays a trap for abortion providers: it could well impose criminal liability on activity that offends some people's sense of what is "properly staffed and equipped" or what arrangements are "satisfactory," but may appear to others as more than adequate. This lack of clarity also allows for arbitrary enforcement by police and prosecutors who may determine that a provider has unlawfully performed an abortion by failing to meet the undefined standard.

Hiedeman responds that the terms "properly" and "satisfactory" "do nothing more than require physicians to adhere to reasonable standard[s]-of-care [ . . . ] applicable more generally under Idaho law." *Def.'s Resp.* at 3, Dkt. 78.  For example, Idaho's medical malpractice statute specifically requires a plaintiff bringing a malpractice action against a health care provider to prove "by direct expert testimony" that the health care provider "failed to meet the applicable standard of health care practice of the community in which such care allegedly was or should have been provided, as such standard existed at the time [ . . . ] and as such standard then and there existed with respect to the class of health care provider that such defendant [ . . . ]belonged to." I.C. § 6-1012.

The malpractice statute further details how health care providers will be judged in malpractice cases: "in comparison with similarly trained and qualified providers of the same class in the same community, taking into account his or her training, experience, and fields of medical specialization, if any." *Id.*  Additionally, the statute  defines "community" as the "geographical area ordinarily served by the licensed general hospital at or nearest to which such care was or allegedly should have been provided." *Id.* Finally, section 6-1013 specifies the requirements an expert must satisfy before the expert may testify regarding the applicable standard of care and the doctor's alleged failure to meet that standard.  I.C. § 6-1013.

By contrast, section 18-608(1) – a criminal statute – nowhere mentions the community standard of care, much less defines it.  Statutes carrying criminal penalties demand more clarity than those imposing only civil liability. The legislature could have

easily tied the terms "proper" and "satisfactory" in section 18-608(1) to reasonable standards-of-care, just as it did in the medical malpractice statute.  But it did not. From this omission the Court can only conclude that the legislature did not intend to import the medical malpractice community standard of care definition into section 18-608(1).

Even if the legislature did intend to incorporate the civil malpractice standard into section 18-608(1), this would only exacerbate – not cure – the vagueness problem.  By definition, the community standard of care varies according to time and place.  This could mean that a physician in Boise performing abortions may face criminal prosecution while a physician in another community would not – even though both physicians engaged in the same conduct.  A standard that would impose criminal liability on one Idaho physician but not another for the same conduct does not pass constitutional muster.

Relying upon an objective standard of care, which must be established by expert testimony, could still chill physicians from performing first trimester abortions given that the physician would be subject to prosecution if other physicians disagreed with his or her definition of "proper" and "satisfactory."  The highest degree of good faith in the world will not save the physician from criminal liability if, after the fact, a committee of doctors, a judge, or a jury decides the physician did not meet the statutory requirements before performing a first trimester abortion. Thus, the objective standard which Hiedeman would read into the statute would still give physicians inadequate notice of what is permissible, and would deter them from performing constitutionally permitted first trimester abortions.

The inclusion of "knowing" does not save the provision from vagueness.  What must a physician "know" before he is deemed to have violated the statute? Physicians will never know if their conduct will breach the standard of care if the standard is established after the fact with expert testimony. Indeed, given the ambiguity of the terms "properly" and "satisfactory," a physician could almost always say that he believed in good faith that he adhered to section 18-608(1)'s requirements.  Would that mean that a physician performing the abortion did not violate the statute even if other doctors later opine that the physician failed to meet the statutory requirements?  Rather than face this uncertainty, many physicians will choose not to perform first trimester abortions in their offices or  clinics, even if they believe it is "properly staffed and equipped" and that they have made "satisfactory" hospital arrangements.

So, distilled down, Hiedeman argues that a standard – which is not in the statute, but if it were, would vary according to local community standards and require expert testimony to prove – somehow saves the statute from vagueness.  To state this argument is to refute it.  Can Dr. Hearn, who is concerned with the vagueness of the statute, really welcome a ruling under which every abortion creates the possibility of a prosecution in which the state invites the jury to disagree with the physician's assessment of the adequacy of his staffing and equipment? A standard that varies by community and requires expert testimony to decipher does not adequately warn Idaho physicians of what

conduct is proscribed.  Greater precision is required before a statute may subject physicians to possible criminal punishment.[3]

### (3) Section 18-605 in Conjunction with Section 18-608(2)

Section18-605 in conjunction with section 18-608(2) penalizes abortion providers for performing second trimester abortions outside a hospital.  The Supreme Court has held in two separate opinions that prohibiting outpatient procedures in a clinic after the first trimester was an impermissible burden on a woman's right to an abortion. *City of Akron v. Akron Center for Reproductive Health, Inc*., 462 U.S. 416, 438-39 (1983); *Planned Parenthood Ass'n of Kansas City, Mo., Inc. v. Ashcroft*, 462 U.S. 476, 481-82 (1983).  And the Supreme Court has not reversed itself on the question of whether a state may properly require that second trimester abortions be performed in a hospital.  Indeed, the Idaho Attorney General had previously given an opinion that the statute was unconstitutional.  *January 26, 1998 Opinion Letter to John H. Tippets*, Ex. A to Counsel Aff., Dkt. 6.  For the reasons the Supreme Court stated in *City of Akron*, this Court finds that the second trimester hospitalization requirement set forth in section 18-608(2)

---

[3] In *Karlin v. Foust*, 188 F.3d 446 (7th Cir. 1999), the Seventh Circuit held that an abortion statute that imposes a "reasonable medical judgment" standard was not unduly vague. But the statute involved in *Karlin* only imposed civil forfeiture penalties while the abortion laws at issue here impose criminal penalties. Thus, greater precision is required in this case.

places a substantial obstacle in the path of women seeking an abortion and is therefore unconstitutional.[4]

Hiedeman also argues that "medical abortions after the thirteenth week of pregnancy are almost nil and no evidence establishes that the hospital-only requirement substantially burdens their availability." *Def.'s Resp.* at 19, Dkt. 78.  This argument conflates standing with an analysis of the merits and ignores that Hearn has asserted a facial challenge to section 18-608(2).  Section 18-608(2) requires *all* second trimester abortions be performed in a hospital – not just medical abortions.  Thus, the question is not limited to whether the hospital-only requirement substantially burdens a woman's right to choose a medical abortion in her second trimester.  Instead, the question is whether the hospital-only requirement substantially burdens a woman's right to choose *any* type of second trimester abortion.  The Supreme Court has twice answered this question, "yes." *City of Akron*, 462 U.S. at 438-39; *Planned Parenthood Ass'n of Kansas City, Mo.*, 462 U.S. at 481-82.

### B.  *The Pain-Capable Unborn Child Protection Act*

Dr. Hearn also challenges the enforcement of Chapter 5, the Pain-Capable Unborn Child Protection Act, or the PUCPA.  The PUCPA categorically bans non-therapeutic abortions at and after twenty weeks: "Any person who intentionally or recklessly

---

[4] In an attempt to avoid this plainly binding Supreme Court precedent, Hiedeman retreats to his argument that Hearn lacks standing to challenge section 18-608(2).  But the Court has already addressed and rejected these arguments.  As discussed above, Hearn has standing to challenge section 18-608(2).

performs or attempts to perform an abortion in violation of the provisions of section 18–505, Idaho Code, is guilty of a felony." I.C. § 18–507.  The PUCPA further permits certain persons, including a prosecuting attorney, to file an action for injunctive relief against an abortion provider who violates section 18-505 by performing an abortion at or after twenty weeks. I.C. § 18–508(2).  The PUCPA, however, does not allow penalties to be assessed against the woman who obtained the abortion. *Id.*  And it provides civil remedies in the form of actual damages to "[a]ny woman upon whom an abortion has been performed in violation of the [PUCPA] or the father of the unborn child." I.C. § 18–508(1).

The Idaho legislature enacted the PUCPA in the face of the Idaho Attorney General's declaration that it is likely unconstitutional because it prohibits some non-therapeutic abortions before a fetus has reached viability.  *February 14, 2011 Letter to Idaho State Senator Chuck Winder* at 1, Ex. B to Aff. of Counsel, Dkt. 6. The Attorney General explained in a 17-page opinion letter that the PUCPA "plainly intends to erect a substantial obstacle to the right to choose," and "there is strong reason to believe that [the PUCPA] is unconstitutional under existing precedent." *Id.*

The Idaho legislature's enactment of the PUCPA in light of this opinion is compelling evidence of the legislature's "improper purpose" in enacting it.  At the heart of *Casey* is a determination that the State may not rely on its interest in the potential life of the fetus to place a substantial obstacle to abortion before viability in women's paths. 55 F.Supp. at 877. "An undue burden exists, and therefore a provision of law is invalid, if

*its purpose or effect* is to place a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability." 505 U.S. at 878 (emphasis added).  Therefore, in *Casey*, the Supreme Court held that the state's dual interests in fetal life and maternal health permit only two broad categories of regulations before fetal viability. *Id.*

First, to promote its interest in potential life, the state may take measures to ensure that the woman's choice is informed, no matter the state of pregnancy.  But, such measures cannot hinder or prevent the pregnant woman from deciding whether to have an abortion. *Id*. Second, the state may adopt paternalistic measures to protect the health or safety of a woman seeking an abortion. *Id.*   But, this second category of permissible regulation also has its limits because "[u]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right." *Id.*

The PUCPA does not fall within either category of permissible regulations.  The twenty-week ban applies without regard to whether the fetus has reached viability.  Because the statute contains no exception for cases before viability, the PUCPA unconstitutionally burdens the abortion right.

First, the PUCPA cannot be justified as a legitimate effort on behalf of the State to promote its "profound interest in potential life." *Casey*, 505 U.S. at 878. That is because, as stated previously, *Casey* made clear that all pre-viability measures designed to advance this interest must—as their purpose—persuade the woman to choose childbirth over abortion. *See id*.; *see also id.* at 877 ("[T]he means chosen by the State to further the

interest in potential life must be calculated to inform the woman's choice, not hinder it."). Thus, in *Casey*, the Supreme Court upheld a 24–hour waiting period requirement, the intention of which was to encourage the woman to rethink her decision to have an abortion. But, unlike that provision, the PUCPA is not designed to make women more informed. Rather, as the PUCPA categorically bans non-therapeutic abortions at and after twenty weeks, its clear purpose is simply to narrow the universe of previously allowable pre-viability abortions.

Nor can the PUCPA be justified as a legitimate means to promote maternal health. When the Idaho legislature enacted the PUCPA, no mention was made of the health and safety of the mother.  Rather, as the short title of the statute suggests – the Pain-Capable Unborn Child Protection Act – the primary purpose of the PUCPA is to protect a fetus "from the state at which substantial medical evidence indicates that they are capable of feeling pain." I.C. § 18-503(11).  This language plainly indicates that the purpose of the PUCPA's categorical ban is to protect the fetus – not the mother.

In essence, the PUCPA embodies a legislative judgment equating viability with twenty weeks' gestational age, which the Supreme Court expressly forbids.  In *Planned Parenthood v. Danforth*, the Court explained that "it is not the proper function of the legislature or the courts to place viability, which essentially is a medical concept, at a specific point in the gestation period." 428 U.S. 52, 64 (1976).

The  Court reiterated this holding in *Colautti v. Franklin*:

> Because this point [of viability] may differ with each pregnancy, neither the legislature nor the courts may proclaim one of the elements entering into

> the ascertainment of viability – be it weeks of gestation or fetal weight or any other single factor – as the determinant of when the State has a compelling interest in the life or health of the fetus.

439 U.S. 379, 388-89 (1979).  And in W*ebster v. Reproductive Health Servs.*, 492 U.S. 490 (1989), the Court said again that the determination of whether a particular fetus is viable is a matter of medical judgment, and one element, such as gestational age, should not be given dispositive weight. *Id.* at 516-17 (plurality); *id.* at 526-27 (O'Connor, J., concurring); *id*. at 545 n. 6 (Blackmun, J., joined by Brennan, J., and Marshall, J., concurring and dissenting).

The State's clear disregard of this controlling Supreme Court precedent and its apparent determination to define viability in a manner specifically and repeatedly condemned by the Supreme Court evinces an intent to place an insurmountable obstacle in the path of women seeking non-therapeutic abortions of a nonviable fetus at and after twenty weeks' gestation.  *See Jane L. v. Bangerter*, 102 F.3d 1112, 1117 (10th Cir. 1996).  Because it appears the PUCPA was enacted with the specific purpose of placing an insurmountable obstacle in the path of women seeking an abortion after twenty weeks, but before the fetus has attained viability, the section imposing the categorical ban is unconstitutional.

The PUCPA's ban on some pre-viability abortions is also invalid because it has an impermissible effect. "[A] statute which, while furthering the interest in potential life or some other valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate

ends." *Casey*, 505 U.S. at 877.  Here, an outright ban on abortions at or after twenty weeks' gestation places, not just a substantial obstacle, but an absolute obstacle, in the path of women seeking such abortions.

Hiedeman seeks to avoid the conclusion that the twenty-week ban imposes an undue burden by arguing that medical abortions in the second trimester are an "extraordinary occurrence." But "[t]he proper focus of constitutional inquiry is the group for whom the law is a restriction, not the group for whom the law is irrelevant." *Casey*, 505 U.S. at 894. In this case, the PUCPA is an absolute prohibition on abortions at or after twenty weeks. And the PUCPA does not just ban medical abortions after 20 weeks – it applies to all second trimester abortions performed in Idaho.  The restriction on that fraction of women, then, is the "proper focus of constitutional inquiry."

Hiedeman also suggests that Hearn's challenge to the PUCPA should be denied because Hearn fails to establish the absence of a material disputed fact with respect to his standing.  The Court has already determined that Hearn has standing to challenge all of the relevant provisions even if medical abortions are rare in the second trimester.  As already discussed, questions of fact related to either Hearn's competence to perform medical abortions or medical organizations' acceptance of medical abortions does not alter the fact that Hearn faces a credible threat of prosecution under the statue.  And, as discussed, Hearn has third-party standing to represent the rights of women seeking a second trimester abortion. Therefore Hiedeman's defense of the PUCPA fails.

## ORDER

**IT IS ORDERED that:**

1.  Defendant's motion for partial summary judgment (Dkt. 58) is DENIED.

2.  Plaintiffs' motion for partial summary judgment (Dkt. 71) is GRANTED.

DATED: March 6, 2013

B. Lynn Winmill
Chief Judge
United States District Court